```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
                                  :
THE ESTATE OF MICKEY MANTLE, MICKEY:
CHARLES MANTLE MARITAL TRUST II, BY:
ITS DULY EMPOWERED EXECUTRIX AND  :
TRUSTEE, MERLYN LOUISE MANTLE,    :
                                  :
        Plaintiff-               :       04 CV 4310(KMW)(HBP)
        Counterclaim Defendant,  :             Order
                                  :
        -against-                :
                                  :
LEWIS E. ROTHGEB and BASEBALL    :
LEGEND VIDEO, LTD.,              :
                                  :
        Defendants-             :
        Counterclaim Plaintiffs. :
                                  :
----------------------------------X
```

WOOD, U.S.D.J.:

I. <u>Overview</u>

In this Order, the Court (1) reconsiders and modifies in part the Court's December 21, 2007 Order (the "12/21/07 Order"), which denied Plaintiff's motion for partial summary judgment and granted in part and denied in part Defendants' motion for summary judgment; and (2) addresses Plaintiff's motion to dismiss Defendants' counterclaims. For the reasons stated below, the Court (1) holds that the contract at issue in this action does not authorize Defendants' alleged website activities; and (2) grants Plaintiff's motion to dismiss Defendants' counterclaims.

This action arises from an April 11, 1988 agreement between

the late baseball player Mickey Mantle[1] and Defendant Lewis
Rothgeb (the "Agreement"), pursuant to which Defendant Rothgeb
agreed to produce and distribute a documentary film about Mr.
Mantle (the "Picture").  Mr. Mantle and Defendant Baseball Legend
Video, Ltd. ("BLV") amended the Agreement on May 1, 1989 (the
"Amendment").[2]  The Amended Agreement provided that BLV would pay
Mr. Mantle royalties from the Picture and merchandise sales.  It
gave BLV the right to use Mr. Mantle's name, biography, physical
likeness, and voice (the "Mantle Indicia") for limited purposes
related to promoting the Picture and Picture-related merchandise.
See Agreement ¶¶ 3.2, 4.1, 4.5; Amendment ¶¶ 1, 2.  It also
required Mr. Mantle to "perform such services as may be
reasonably required," including identifying potential purchasers
of the Picture.  See Agreement ¶ 2.1.

Plaintiff filed suit against Defendants on June 8, 2004,
alleging (1) breach of contract; (2) trademark infringement and
dilution; (3) infringement of the right to publicity; (4) false
designation of origin; (5) unfair competition; (6)

---

[1] Mickey Mantle died in 1995, after which Plaintiff
succeeded to all of his rights.

[2] The Court will refer to the Agreement and the Amendment
together as the "Amended Agreement."  BLV is a business entity
controlled by Mr. Rothgeb, to which he has assigned his rights
under the Agreement.

misappropriation of goodwill; and (7) unjust enrichment.[3]

Plaintiff also sought (1) a declaratory judgment that the
contract among the parties has terminated (the "Termination
claim"); and (2) an accounting of Defendants' income arising from
their alleged breach of contract (the "Accounting claim"). In
their amended Answer, Defendants asserted counterclaims for
breach of contract and tortious interference with prospective
business relations.

## II. Reconsideration of 12/21/07 Order

By its own motion, the Court reconsiders and modifies in
part its 12/21/07 Order. See Gordon & Breach Science Publishers
S.A. v. American Institute of Physics, 905 F. Supp. 169, 177
(S.D.N.Y. 1995) ("A district court has the inherent authority to
reconsider and modify its interlocutory orders."). In the
12/21/07 Order, the Court held, inter alia, that the Amended
Agreement was ambiguous with respect to whether it authorized
Defendants' alleged website activities. The Court relied on this
holding in its analysis of (1) Plaintiff's contract claims
regarding Defendants' website activities, (2) the Termination
claim, and (3) the trademark-related claims (together, the "three
affected claims"). On reconsideration, the Court concludes that
the Amended Agreement is unambiguous and does not authorize

---

[3] The Court shall refer to claims 2 through 7, collectively,
as Plaintiff's "trademark-related claims."

3

Defendants' website activities.  However, because there are
remaining questions of material fact regarding the three affected
claims, the Court denies both Plaintiff and Defendants summary
judgment with respect to these claims.

A. Background

On February 6, 2007, Defendants filed a motion for summary
judgment with respect to the entire Complaint.  On February 8,
2007, Plaintiff filed a motion for partial summary judgment with
respect to its claims for (1) breach of contract; (2) trademark
infringement and dilution; (3) unfair competition; (4) false
designation of origin; and (5) declaratory judgment.  The Court
referred both motions to Magistrate Judge Pitman.[4]

On August 22, 2007, Magistrate Judge Pitman issued a Report

_____

[4] Plaintiff alleged that Defendants breached the Amended
Agreement by, inter alia, (1) failing to pay Plaintiff royalties
owed or to provide an accounting (the "Royalty and Accounting
claims"); (2) creating an online "Yahoo Store" on the website
yahoo.com that sold unauthorized merchandise (the "Yahoo Store");
(3) creating a website themick.com (the "Website") that described
itself as "official" and offered links to and direct sales of
products that had no relation to the Picture or Mickey Mantle;
and (4) publishing a book entitled Mickey Mantle: The American
Dream Comes to Life (the "Book claim").  Defendants responded
that (1) they did not owe Plaintiffs any royalties or accounting;
(2) their actions were permitted by the plain language of the
Amended Agreement; and (3) Plaintiff's contract claims were
barred by the statute of limitations.
    Plaintiff also alleged that Defendants' unauthorized use of
the Mantle Indicia violated the Lanham Act, see 15 U.S.C. §§
1114(1), 1125(a), the Federal Trademark Dilution Act of 1996, see
15 U.S.C. § 1125(c), and New York state common law.  Defendants
responded that (1) their actions were permitted by the plain
language of the Amended Agreement; and (2) Plaintiff's
trademark-related claims were barred by laches.

and Recommendation (the "8/22/07 Report"), familiarity with which is assumed.[5]  In the 12/21/07 Order, the Court adopted the 8/22/07 Report in part.  The Court held, <u>inter alia</u>, that the Amended Agreement was ambiguous with respect to whether it permitted Defendants' alleged website activities,[6] and the Court relied on this conclusion in its analysis of the three affected claims.  The Court now (1) reconsiders and modifies its holding that the Amended Agreement is ambiguous, and (2) analyzes the implications of its modified holding for the three affected claims.[7]

   B. <u>Lack of Ambiguity in the Amended Agreement</u>

_____

   [5] The 8/22/07 Report recommended that the Court (1) deny Plaintiff's motion for partial summary judgment; and (2) grant in part and deny in part Defendants' motion for summary judgment. Both parties timely objected to the Report, and Defendants timely replied to Plaintiff's objections.

   [6] The Court adopted the 8/22/07 Report's analysis of this issue.  <u>See</u> 12/21/07 Order 7-8; 8/22/07 Report 52-56.

   [7] The Court does not reconsider or modify its other analysis in the 12/21/07 Order.  In that order, the Court granted Defendants summary judgment with respect to the Royalty and Accounting claims and the Book claim.  The Court also granted Defendants summary claims with respect to any claims that pre-dated the establishment of the Website.  Finally, the Court granted Defendants summary judgment with respect to the following trademark-related claims: (1) Plaintiff's Lanham Act § 32(1) claim, (2) Plaintiff's trademark-related claims with respect to the Book, and (3) Plaintiff's Federal Trademark Dilution Act of 1996 claim.  The Court denied Defendants summary judgment with respect to their statute of limitations and laches defenses to Plaintiffs' contract and trademark-related claims.  The Court also denied Plaintiff's motion for partial summary judgment in its entirety.

1. <u>Texas Law on Contract Ambiguity</u>

Pursuant to Texas law,[8] the Court must interpret a contract by first looking to "the objective intent of the parties as expressed by the plain language of the writing – the so-called four corners rule – in the light of 'attending circumstances.'" <u>Corley v. Entergy Corp.</u>, 246 F. Supp. 2d 565, 573 (E.D. Tex. 2003). The "court is bound to read all parts of a contract together to ascertain the agreement of the parties." <u>Forbau v. Aetna Life Ins. Co.</u>, 876 S.W.2d 132, 133 (Tex. 1994). If a contract is unambiguous, parol evidence is inadmissible either to contradict or vary the express terms of the agreement. <u>See</u> <u>Bio-Med. Applications of Texas, Inc. v. BAP-FMC San Antonio, Ltd.</u>, No. Civ.A. SA03CA1302FBN, 2005 WL 2177167, at *4 (W.D. Tex. Aug. 31, 2005). "A [contract] term is not ambiguous because of a simple lack of clarity. . . . An ambiguity arises only after the application of established rules of construction leaves an agreement susceptible to more than one meaning. Further, for an ambiguity to exist, both potential meanings must be reasonable." <u>DeWitt County Elec. Co-op., Inc. v. Parks</u>, 1 S.W.3d 96, 100 (Tex. 1999).

2. <u>Analysis of Amended Agreement</u>

The Amended Agreement grants BLV "the perpetual and

---

[8] The Court interprets the Amended Agreement pursuant to its Texas choice of law provision. <u>See</u> 8/22/07 Report 24.

exclusive right to use, and to license or authorize others to use," the Mantle Indicia for (1) "purposes of advertising, publicizing, promoting, and otherwise exploiting the Picture and the production, distribution and exploitation thereof . . . .", and (2) "engaging in the merchandising and commercial tie-ups of products and services of all kinds relating to the Picture . . . ." Amendment ¶ 1.  However, the Amended Agreement grants these rights with the proviso that "in connection with any such use [of the Mantle Indicia] it shall refer only to the Picture or to Mantle's services furnished hereunder which shall not depict Mantle as using or endorsing any product, commodity, or service, other than the Picture itself, without Mantle's further agreement."  Amendment ¶ 1.  The Amended Agreement provides one non-exclusive example of a permitted "exploitation of Mantle's name or likeness": "the merchandising of clothing bearing the logo of the Picture and Mantle's likeness." Amendment ¶ 2.2.

Because the Website uses the Mantle Indicia, Defendants must abide by the Amended Agreement's terms.[9]  The Amended Agreement

_____

[9] The Court notes that the Amended Agreement does permit the use of a website for purposes of promoting the Picture.  The agreement provides BLV with a broad grant of authority to use the Mantle Indicia for "purposes of advertising, publicizing, promoting, and otherwise exploiting the Picture."  Amendment ¶ 1. The use of a website to promote the Picture is consistent with this language and with the contract's purpose of promoting the Picture for Plaintiff's and Defendants' mutual gain.  See Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co., 145 F.3d 481, 487 (2d Cir. 1998) (holding that an agreement was "more reasonably read to include than to exclude a [new technology]"

7

unambiguously requires that the Mantle Indicia be used only in reference to the Picture, and specifically prohibits using the Mantle Indicia for endorsing anything but the Picture itself. The Court concludes that the following alleged website activities are not authorized by the Amended Agreement: (1) Defendants' manufacture and sale of merchandise that uses the Mantle Indicia without referencing the Picture's title or logo; (2) Defendants' sale through the Website of merchandise, produced by other manufacturers, which uses the Mantle Indicia without referencing the Picture's title or logo (the "third-party merchandise"), and links through the Website to products and services that have no relation to the Picture; (3) the Website's failure to directly reference the Picture on approximately fifty percent of its pages; and (4) the Website's self-description as "The Official Mickey Mantle Website" and "The Official Licensed Web Site and Catalogue."[10]

---

and affirming a district court's dismissal of a plaintiff's contract breach action).  Therefore, the issue before the Court is whether Defendants' website activities exceed the scope of the rights granted by the Amended Agreement.

[10] Defendants do <u>not</u> concede that they manufactured and sold merchandise that does not directly reference the Picture, and the parties have produced conflicting evidence on this issue.  <u>See</u> Def. 56.1 Counterstat. (D.E. 67) ¶ 27, Rothgeb Decl. (D.E. 36) ¶ 25, Rothgeb Dep. Tr. 267 (Amended Weber Decl. Ex. I).  Therefore, the Court concludes there is a triable issue of fact on this question.  However, Defendants do concede that (1) they sold third-party merchandise on the Website that does not directly reference the Picture, <u>see</u> Def. 56.1 Counterstatement (D.E. 67) ¶ 28 (stating that the third-party merchandise relates to the

First, the Amended Agreement does not authorize Defendants
to manufacture and sell merchandise that uses the Mantle Indicia
without referencing the Picture's title or logo. The Amended
Agreement states that Defendants may use the Mantle Indicia for
merchandising the Picture, provided that "it shall refer only to
the Picture." Amendment ¶ 1. The Court must interpret the term
"refer" according to its "plain, ordinary, and generally accepted
meanings." Nichols v. Enterasys Networks, Inc., 495 F.3d 185, 190
(5th Cir. 2007). In this context, the ordinary meaning of refer
is "to make mention or reference" to. See American Heritage
Dictionary, 4th Ed.; see also Gary Pools, Inc. v. McCaffety, No.
03-99-00390-cv, 2000 WL 298279, at *1 (Tex. App. Mar. 23, 2000)
(citing a dictionary definition for the "plain meaning" of a
word). The Court therefore concludes that any merchandise
produced by Defendants must have some explicit reference to the
Picture, using either its title or logo. This interpretation is
reinforced by the one example of merchandise that is explicitly
allowed in the Amended Agreement itself: "the merchandising of

Picture only by the use of Mantle's name and biography), Rothgeb
Supp. Dec. (D.E. 68) ¶ 4; (2) the Website offers links to
websites that do not refer to the Picture, see Def. 56.1
Counterstatement (D.E. 67) ¶ 21; (3) approximately fifty percent
of the Website's pages do not directly reference the Picture,
see Def. 56.1 Counterstatement (D.E. 67) ¶ 20; and (4) the
Website uses the term "The Official Mickey Mantle Website" and
"The Official Licensed Web Site and Catalogue," see Def. 56.1
Counterstatement (D.E. 67) ¶ 19. Therefore, there is no triable
issue of fact with respect to whether Defendants undertook these
website activities.

clothing bearing the logo of the Picture and Mantle's likeness."
<u>See</u> Amendment ¶ 2.2.  Read as a whole, the Amended Agreement
clearly indicates that merchandise made and sold by Defendants
must explicitly reference the Picture.

Second, the Amended Agreement does not authorize Defendants
to sell third-party merchandise on the Website or link to other
products and services that do not explicitly refer to the
Picture.  The Website makes extensive use of the Mantle Indicia
and explicitly states that it is "licensed" by Mr. Mantle.
Accordingly, its contents must "refer only" to the Picture, and
"shall not depict Mantle as using or endorsing any product,
commodity, or service, other than the Picture itself, without
Mantle's further agreement."  Amendment ¶ 1.  Products and links
that do not directly reference the Picture fall outside this
narrow grant of rights.

Third, the Amended Agreement does not authorize Defendants
to create a website that uses the Mantle Indicia yet fails to
directly reference the Picture on approximately fifty percent of
its pages (the "non-Picture pages").[11]  The non-Picture pages
clearly help "promote" the Picture, by attracting people with an
interest in Mr. Mantle and promoting interest in Mr. Mantle's
career.  However, because the Website uses the Mantle Indicia,

---

[11] These pages generally provide information about Mantle's
life and career, such as quizzes and lists of statistics.

the Amended Agreement requires that the Website "refer only to" the Picture.  Taken as a whole, the non-Picture pages create the impression that the Website is a general Mickey Mantle biographical site, with information about the Picture as only one element of its contents.  Accordingly, the non-Picture pages violate the Amended Agreement's terms.

Fourth, in light of the Website's breadth, including the non-Picture pages, its sale of third-party merchandise, and its links to other websites, the Website's self-description as "The Official Mickey Mantle Website" and "The Official Licensed Web Site and Catalogue" is not authorized by the Amended Agreement. These terms exceed the rights granted to Defendants because they (1) use Mr. Mantle's name to promote products and website content that is unrelated to the Picture, and (2) erroneously indicate that Mr. Mantle endorses these products and content.

The Court therefore modifies the 12/21/07 Order, and holds that the Amended Agreement does not authorize Defendants' alleged website activities.  Because the Court relied on this conclusion in its analysis of the three affected claims, the Court reconsiders each of these claims in turn.

C. <u>Website-Related Breach of Contract Claims</u>

Plaintiff and Defendants each move for summary judgment with

respect to the Website-related contract claims.[12]  Defendants

argue, _inter alia_, that the Court should grant them summary

judgment because their website activities were authorized by the

Amended Agreement.  In the 12/21/07 Order, the Court denied

Defendants summary judgment on this ground because it concluded

the Amended Agreement was ambiguous.  On reconsideration, the

Court rejects Defendants' argument that their website activities

were authorized by the Amended Agreement, and again denies

Defendants summary judgment.  However, the Court also denies

Plaintiff summary judgment regarding its Website-related contract

claims, because there are remaining disputes of material fact

regarding these claims.[13]

---

[12] The Court refers to Plaintiff's breach of contract claims
regarding the Website and Yahoo Store as the "Website-related
contract claims" or as claims relating to "Defendants' website
activities."

[13] The Court notes that Plaintiff has produced evidence of a
breach of contract.  Defendants concede they undertook the
alleged website activities, with the exception of manufacturing
products that did not refer to the Picture.  See supra note 10;
see also Brennan's Inc. v. Dickie Brennan & Co. Inc., 376 F.3d
356, 364 (5th Cir. 2004)(noting that a defendant who exceeds the
rights granted to him by a license can be liable for contract
breach); Bunn-O-Matic Corp. v. Bunn Coffee Service, Inc. 88 F.
Supp. 2d 914, 921-22 (C.D. Ill. 2000)(same).  Plaintiff also has
submitted letters supporting a finding that Plaintiff notified
Defendants of their breach.  See Agreement ¶ 10.2 (stating that
in order for Defendants' actions to constitute a breach,
Plaintiff must first notify Defendants "in writing setting forth
such alleged breach or default"); see also Apr. 28, 1999 Ltr.
(Weber Dec. Ex. D at 20-21 (D.E. 58-9)) (providing "formal notice
to [Mr. Rothgeb] that [he is] in material breach of the contract
for . . . [i]nfringing use of Mickey Mantle's Right of Publicity,
including but not limited to, producing and selling merchandise

First, there is a question of fact regarding when Defendants
began their website activities, and accordingly, whether
Plaintiff's action is barred by the statute of limitations.  See
12/21/07 Order 8-9.[14]   Second, there is a factual dispute
regarding whether Defendants manufactured merchandise without the
Picture's logo or title.  See supra note 10.  Third, neither side
presented evidence to the Court regarding Plaintiff's damages
from the contract breach, and Plaintiff acknowledged that there
is a factual dispute with respect to damages.  See Pl. Opp. 22;
Taub v. Houston Pipeline Co., 75 S.W.3d 606, 615 (Tex. App. 2002)

_____

beyond that specified by the language of the Agreement and the
understanding of the parties," and demanding that Mr. Rothgeb
remove "content commercially exploiting the [Mantle Indicia] at
[his] website.").  Defendants never argued in their briefing that
this notice was insufficient.

[14] As the Court noted in its 12/21/07 Order, Defendants
failed to show the absence of a factual dispute under either New
York's six-year statute of limitations, see N.Y. C.P.L.R. §
213(2) (McKinney 2004), or Texas' four-year statute of
limitations, see Tex. Civ. Prac. & Rem. Code Ann. § 16.051
(Vernon 1997).  Accordingly, the Court did not reach the question
of which statute of limitations applies.  Although the issue was
not briefed by the parties, the Court notes that "New York courts
treat statutes of limitations as part of the forum's procedure,
and therefore apply New York statutes of limitations even if the
underlying claim ultimately will be governed by the substantive
law of another jurisdiction." Architectronics, Inc. v. Control
Sys., Inc., 935 F. Supp. 425, 431 (S.D.N.Y. 1996).  However,
Defendants may be able to show that New York's borrowing statute
applies and that the Court should therefore apply Texas' four-
year statute of limitations.  See N.Y. C.P.L.R. § 202 (McKinney
2004).  The burden is on Defendants to show, inter alia, that
Plaintiff's cause of action "accrued" outside New York.  See
Maslan v. American Airlines, Inc., 885 F. Supp. 90, 93 (S.D.N.Y.
1995).

(an element of a breach of contract claim is "damages to the
plaintiff resulting from the breach").  The Court therefore
denies both Plaintiff and Defendants summary judgment with
respect to Plaintiff's website-related contract claims.

     D. Termination Claim

     Plaintiff and Defendants also each move for summary judgment
with respect to the Termination claim.  Defendants argue, inter
alia, that the Court should dismiss the Termination claim because
Defendants did not breach the Amended Agreement.  In its 12/21/07
Order, the Court denied Defendants summary judgment on this
ground because it concluded that the Amended Agreement was
ambiguous.[15]  See 12/21/07 Order 10.  On reconsideration, the
Court holds that Defendants committed a material breach of the
Amended Agreement,[16] and that Plaintiff has therefore

---

     [15] The 12/21/07 Order correctly held that the Amended
Agreement could be terminated only if Defendants were in material
breach of the Amended Agreement.  See A.G.E., Inc. v. Buford, 105
S.W.3d 667, 676 (Tex. App. 2003) ("[A] party to a contract may
elect to terminate the contract . . . if the other party . . .
commits a material breach.") (emphasis added); see also Arthur
Guinness & Sons, PLC v. Sterling Pub. Co., Inc., 732 F.2d 1095,
1101 (2d Cir. 1984) (a licensing agreement that permitted
termination only for "wilfully br[eaking] an important
obligation" was not legally terminated when a party ostensibly
terminated the agreement but the other party had not broken an
important obligation).

     [16] Defendants' breach is material because, by using the
Mantle Indicia in a manner inconsistent with the Amended
Agreement's narrow license, Defendants significantly "deprived
[Plaintiff] of the benefit that it could have reasonably
anticipated from full performance."  Hernandez v. Gulf Group
Lloyds, 875 S.W.2d 691, 693 (Tex. 1994); see also Mustang

14

demonstrated a valid basis for terminating the Amended Agreement. However, because there is a genuine issue of material fact regarding whether Plaintiff actually terminated the Amended Agreement prior to commencing litigation, the Court denies Plaintiff summary judgment on its Termination claim.[17]

The Amended Agreement provides that Defendants are formally in breach of contract only if Plaintiff notifies them of the breach and they fail to cure within thirty days (the "notice and cure provision").[18]  Because Plaintiff has a right to terminate the Amended Agreement only on the basis of a breach, see A.G.E., Inc. v. Buford, 105 S.W.3d 667, 676 (Tex. App. 2003), Plaintiff must comply with the notice and cure provision before having the right to terminate the contract.  Although Plaintiff has produced two sets of letters purporting to notify Defendants of their breaches and terminate the Amended Agreement, the Court concludes

_____

Pipeline Co., Inc. v. Driver Pipeline Co., Inc., 134 S.W.3d 195, 199 (Tex. 2004).

[17] Even if Plaintiff did not terminate the Amended Agreement prior to commencing litigation, Plaintiff may still request a declaratory judgment terminating the Amended Agreement going forward.  However, it is unclear from Plaintiff's briefing whether Plaintiff requests such a declaratory judgment, and the Court therefore does not reach this issue.  Plaintiff may clarify its position in its pre-trial memorandum.

[18] "No act or ommission of [Defendants] . . . shall constitute an event of . . . breach . . . unless [Plaintiff] shall first notify [Defendants] in writing setting forth such alleged breach or default," and Defendants "shall not commence reasonable efforts to cure" the breach within thirty days. Agreement ¶ 10.2.

that there are questions of fact regarding whether Plaintiff validly terminated the Amended Agreement, as set forth below.

### 1. February 10, 1998 and August 20, 1998 Letters

By letter dated February 10, 1998, Plaintiff notified Defendants that they "had no license to produce and sell items utilizing Mr. Mantle's publicity rights except as specifically limited by the Agreement." See Pl. Feb. 10 1998 Ltr. (D.E. 58-8, at 40). By letter dated August 20, 1998, Plaintiff purported to terminate the Amended Agreement on the basis of Defendants' failure to cure its breach. See Aug. 20, 1998 Ltr. (D.E. 58-27). The Court cannot conclude as a matter of law that these letters terminated the Amended Agreement.

First, the record before the Court does not establish that Plaintiff met the notice and cure provision as a matter of law. Defendants allegedly responded to Plaintiffs' letter on the same day they received it, and asked Plaintiff to clarify the grounds of breach. See Def. Feb. 10, 1998 Ltr. (D.E. 58-8, at 29). Plaintiff did not produce evidence that it responded to Defendants' request for clarification. Plaintiff also did not produce evidence of previous correspondence or conversations with Defendants that would have rendered a response to Defendants' letter unnecessary.[19] In light of Defendants' request for

_____

[19] The February 10, 1998 letter referred generally to unattached previous correspondence and stated that Mr. Rothgeb "had no license to produce and sell items utilizing Mr. Mantle's

16

clarification, Plaintiff's notice to Defendants may have been insufficient pursuant to the notice and cure provision. Summary judgment for Plaintiff is therefore inappropriate.

In addition, Defendants have submitted evidence that they never produced unrelated merchandise, and therefore never breached this component of the Amended Agreement. See supra note 10. Because Defendants may be able to prove that Plaintiff's February 10, 1998 letter had no factual basis, the Court cannot conclude as a matter of law that Plaintiff's subsequent termination was valid. Summary judgment is therefore inappropriate on this ground as well.

2. April 28, 1999 Letter

By letter dated April 28, 1999, Plaintiff provided Defendants notice that their website activities were in breach of the Amended Agreement. See Apr. 28, 1999 Ltr. (D.E. 58-9, at 20-21); May 8, 2000 Ltr. (D.E. 58-9, at 37-38); supra note 13. However, Plaintiff did not produce evidence that it terminated the Amended Agreement after it provided Defendants notice of these breaches. Because Plaintiff has not demonstrated that it terminated the Amended Agreement following its April 28, 1999 letter, summary judgment on the basis of the April 28, 1999

publicity rights except as specifically limited by the Agreement." See Feb. 10, 1998 Ltr.

letter is also inappropriate.[20]

Accordingly, the Court denies summary judgment to either party with respect to the Termination Claim.

E. <u>Trademark-Related Claims</u>

Defendants seek summary judgment on Plaintiff's trademark-related claims because, <u>inter alia</u>, Defendants' website activities were allegedly authorized by the plain language of the Amended Agreement.  In the 12/21/07 Order, the Court held that summary judgment on this ground was inappropriate because the Amended Agreement was ambiguous.  <u>See</u> 12/21/07 Order 15.  On reconsideration, the Court concludes that Defendants' argument lacks merit, because the Amended Agreement did not authorize Defendants' website activities.

However, the Court notes that Defendants also assert an affirmative defense that Plaintiff's trademark-related claims are barred by laches.  Because there are genuine issues of material fact regarding when Plaintiff became aware of the Website's content, the Court cannot determine as a matter of law whether Defendants' laches defense has merit.  <u>See</u> 12/21/07 Order 12-15;

---

[20] Although Plaintiff produced earlier letters purporting to "terminate" the Amended Agreement, these letters are legally inoperative because Defendants were not yet in breach of the Amended Agreement. <u>See</u> <u>Hydril Co., L.P. v. Grant Prideco, L.P.</u>, No. H-05-0337, 2007 WL 1791663, at *4-5 (S.D. Tex. Jun. 19, 2007) (holding that when a contract required notice prior to termination, a plaintiff must follow that procedure in order to legally terminate the contract).

18

8/22/07 Report 43-47.  The Court therefore denies summary judgment to either side with respect to the trademark-related claims.

In conclusion, the Court modifies its 12/21/07 Order and holds that the Amended Agreement does not authorize Defendants' website activities.  The Court denies summary judgment to either party regarding the three affected claims, because there are disputes of material fact regarding each claim.

III. Motion to Dismiss Counterclaims

By notice of motion dated May 18, 2005, Plaintiff moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Defendants' counterclaims for tortious interference with prospective business relations and breach of contract (the "counterclaims").  On November 6, 2007, Magistrate Judge Henry B. Pitman issued a Report and Recommendation ("11/6/07 Report"), familiarity with which is assumed, recommending that the Court dismiss Defendants' counterclaims as time-barred.  Defendants filed timely objections to the Report.  For the reasons stated below, the Court concludes that Defendants' objections are meritless and dismisses the counterclaims.

A. Background

Defendants allege counterclaims against Plaintiff arising

from two incidents.[21]  First, Defendants allege that Plaintiff

told the Madison Square Garden Network ("MSG") that Defendants

were not authorized to promote the Picture or related merchandise

and threatened to sue MSG if it engaged in promotion of the

Picture (the "MSG incident").  Defendants claim that the MSG

incident (1) constituted tortious interference with Defendants'

prospective business relations (the "Tortious Interference

counterclaim"), and (2) breached the Amended Agreement.[22]

Second, Defendants allege that Plaintiff refused to provide

Defendants with the names, addresses, and telephone numbers of

prospective purchasers of the Picture.  Defendants claim that

this refusal breached the Amended Agreement.

B. Discussion

_____The Court must consider de novo any portion of the Report to

which Defendants have objected.  See 28 U.S.C. § 636(b)(1); Fed.

R. Civ. P. 72(b).  In reaching its decision, the Court has

carefully considered the Report, and the arguments contained

therein, as well as the briefs that the parties have submitted.

Defendants concede that their counterclaims are time-barred

to the extent the counterclaims seek affirmative relief.  See

---

[21] Defendants made two other breach of contract counterclaims
that they later withdrew.  See 11/6/07 Report 13 n.3.

[22] The Court refers to these allegations together as the "MSG
counterclaims."

Opp. Mem. 16; see also Report 11-13.[23]  However, they argue that their counterclaims can be asserted for equitable recoupment purposes pursuant to New York's revival statute, N.Y. C.P.L.R. § 203(d) (the "N.Y. Revival Statute" or "§ 203(d)"). The Report concluded that Defendants' counterclaims were time-barred and that § 203(d) did not exempt the counterclaims from the applicable statutes of limitations.  The Court agrees, and dismisses Defendants' counterclaims.

    1. <u>N.Y. Revival Statute</u>

    The N.Y. Revival Statute provides that if a counterclaim "arose from the transactions, occurrences, or series of transactions or occurrences, upon which a claim asserted in the complaint depends," then "it is not barred to the extent of the demand in the complaint notwithstanding that it was barred at the time the claims asserted in the complaint were interposed." N.Y. C.P.L.R. § 203(d).  The statute permits a "defendant to assert an otherwise untimely claim which arose out of the same transactions alleged in the complaint, but only as a shield for recoupment purposes, and does not permit a defendant to obtain affirmative relief." <u>DeMille v. DeMille</u>, 5 A.D.3d 428, 429 (N.Y. App. Div. 2004).  New York courts have "generally required a tight nexus between claim and counterclaim before section 203(d) will save a

---

[23] The 11/6/07 Report correctly concluded that Defendants' counterclaims are governed by New York law regarding statutes of limitations. <u>See</u> Report 10-13.

21

counterclaim from an otherwise-applicable statute of limitations." Macaluso v. U.S. Life Ins. Co., No. 03 cv 2337, 2004 WL 1497606, at *7 (S.D.N.Y. July 2, 2004); see also LaLoggia v. Document Sec. Sys., Inc., No. 2005/08307, 2006 WL 1465595, at *2 (N.Y. Sup. Ct. Mar. 22, 2006). In order to fall within § 203(d), "the counterclaim must 'seek a recovery-back predicated on some act or fact growing out of the matter constituting the cause or ground of the action brought.'" First Fid. Bank N.A. v. Companhia de Navegacao Maritima Netumar, 637 F. Supp. 1182, 1185 (S.D.N.Y. 1986) (quoting SCM Corp. v. Fisher Park Lane Co., 40 N.Y.2d 788, 791 (N.Y. 1976)).

        2. Defendants' Objections

        Defendants raise three objections to the Report's conclusion that § 203(d) does not apply to the counterclaims. The Court considers each in turn.

            i. Relationship to Royalty and Accounting Claims

        Defendants argue that § 203(d) applies to each of their counterclaims, because their counterclaims are closely related to Plaintiff's Royalty and Accounting contract claims. See Ob. 17, 20-21, 23. In its 12/21/07 Order, the Court dismissed these claims. See supra note 7. The N.Y. Revival Statute does not preserve a counterclaim that arises from a dismissed claim, because the statute can be used "only as a shield for recoupment purposes." DeMille v. DeMille, 5 A.D.3d 428, 429 (N.Y. App. Div.

22

2004); see also 118 East 60th Owners, Inc. v. Bonner Props., Inc., 677 F.2d 200, 203 (2d Cir. 1982) (holding that § 203(d) is available "only to a party that is called upon to defend") (internal quotation omitted).  The Royalty and Accounting claims are no longer before the Court.  Accordingly, they cannot be grounds for recoupment.

### ii. Relationship to Website Claims

Defendants also argue that § 203(d) should apply to their Tortious Interference counterclaim, because this counterclaim is closely related to Plaintiff's website-related contract claims. See Obj. 16-17.  The Court concludes that this objection is without merit.

Defendants argue that the MSG incident is related to Plaintiff's website-related contract claims because Plaintiff intended to prevent Defendants from promoting sales through the Website.  At most, this allegation suggests that Plaintiff's tortious interference was intended as retaliation for Defendants' contract breach.  This alleged relationship between claim and counterclaim is too attenuated for revival pursuant to § 203(d). See, e.g., Messinger v. Mount Sinai Med. Ctr., 279 A.D.2d 344, 345 (N.Y. App. Div. 2001) (dismissing an assault counterclaim because the assault was "arguably only a result of" the plaintiff's malpractice claim).  Accordingly, the Court concludes that "there is no common thread tying the two together to warrant

revival . . . under CPLR 203(d)." Id.[24]

### iii. Relationship to Termination Claim

Defendants argue that § 203(d) should apply to the MSG counterclaims, because these counterclaims are closely related to the Termination claim. The Court concludes that this objection is also without merit.

Defendants argue that a letter that Defendants sent to Plaintiff complaining about the MSG incident allegedly "motivated" Plaintiff to terminate the Amended Agreement. See Ob. 18-19, 20-21. Defendants cite no cases where a court applied § 203(d) in analogous circumstances,[25] and the Court agrees with

_____

[24] Defendants also argue that the Report erred in concluding that the Website became operational eight months after the MSG incident. They contend that the Website became operational approximately three months before the MSG Incident occurred. See Obj. 14-15; Report 18-19. However, the same result would obtain if the Court accepts Defendants' position. Temporal proximity between a claim and a counterclaim is not sufficient to establish that they arose from the same transaction. See Messinger, 279 A.D.2d at 345 (holding that an assault that occurred immediately after an incident of medical malpractice did not "aris[e] from the same occurrence").

[25] In the cases cited by Defendants, the claim and counterclaim have a much closer relationship than do the Termination claim and the MSG counterclaims. See, e.g., Mopex, Inc. v. Am. Stock Exch., LLC, No. 02 cv 1656, 2002 WL 342522, at *6 (S.D.N.Y. Mar. 5, 2002) (applying § 203(d) to a trade secrets counterclaim that was based on the same products at issue in the plaintiff's patent claim); Adler v. Alcide Corp., No. 96 cv 1214, 1998 WL 684597, at *2 (S.D.N.Y. Sept. 30, 1998) (applying § 203(d) when the counterclaim "hinge[d] upon the central question under litigation").

the Report's conclusion that the MSG incident was an isolated event that did not "grow out of" the facts giving rise to the Termination claim.  See Report 18.  Although Defendants' letter may have motivated Plaintiff to terminate the Amended Agreement, the contract termination and the MSG incident are themselves related only in the "most general sense."  See SCM Corp., 40 N.Y.2d at 792; see also Messinger, 279 A.D.2d at 344-45.  The Court therefore concludes that § 203(d) is inapplicable.

IV. Conclusion

For the reasons stated above, the Court (1) reconsiders and modifies in part its 12/21/07 Order (D.E. 87); and (2) adopts the 11/6/07 Report (D.E. 84) in its entirety and GRANTS Plaintiff's motion to dismiss Defendants' counterclaims (D.E. 22).

No later than **March 21, 2008,** the parties shall submit a joint pre-trial order.  The pre-trial order shall conform to the Court's instructions, a copy   may be obtained from the Deputy Clerk.  It shall be accompanied by Memoranda of Law.

SO ORDERED

Dated:   New York, New York
         February 25 , 2008

                                   Kimba M. Wood
                                   United States District Judge